UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| **ALEX FRANCOIS**, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | |
| **WILLIAM BARR**, U.S. Attorney | § | |
| General; **CHAD WOLF**; Acting | § | |
| Secretary, Dept. of Homeland Security; | § | |
| **JOSE CORREA,** Field Office Director, | § | **CAUSE NO. _____** |
| San Antonio Field Office, U.S. | § | |
| Immigration and Customs Enforcement; | § | |
| **MARIO GARCIA**, Warden, Webb | § | **PETITION FOR WRIT OF HABEAS** |
| County Detention Center; **TONY PHAM**, | § | **CORPUS PURSUANT TO 28 U.S.C. §** |
| Acting Director of U.S. Immigration and | § | **2241** |
| Customs Enforcement; and **UNITED** | § | |
| **STATES IMMIGRATION AND** | § | |
| **CUSTOMS ENFORCEMENT**, | § | |
| | § | |
| Respondents. | § | |

**PETITION FOR WRIT OF HABEAS CORPUS**

This is a petition for a writ of habeas corpus filed on behalf of Petitioner Alex Francois

("A.F.") seeking relief to remedy his unlawful detention. A.F. is uniquely vulnerable to contracting

the novel coronavirus disease ("COVID-19") while in the physical custody of Respondents.

Respondents are detaining A.F.—a 61-year-old who has been diagnosed with tachycardia

(condition resulting in rapid heart rate), hepatitis A, hepatitis B, and schizophrenia —during the

rapid outbreak of COVID-19 (or, the "coronavirus"), a deadly virus for which there is no publicly

available vaccine and no cure. A.F. now faces the strong possibility of suffering severe illness or

death because of COVID-19. ICE reports 94 cases at the Webb County Detention Facility ("Webb").[1] By continuing to detain A.F. in conditions that expose him to an impermissibly high risk of contracting COVID-19, Respondents violate A.F.'s rights under the Due Process Clause of the Fifth and Fourteenth Amendments, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and customary international law. A.F. petitions this Court to issue a Writ of Habeas Corpus and order his release from detention, among other requested relief.

A.F. received a Notice to Appear dated January 19, 2018.[2] On or around January 2018, A.F. was placed in the custody of South Texas Detention Complex in Pearsall, Texas.[3] Over the course of approximately eight (8) months, A.F. appeared *pro se* before the Immigration Court, until retaining *pro bono* representation on September 17, 2018. A.F. filed for withholding of removal and relief under the Convention Against Torture ("CAT").[4] The Immigration Judge ("IJ") granted withholding of removal pursuant to INA § 241(b)(3) and DHS appealed the decision.[5] The Board found no clear error in the IJ's decision, but directed the IJ to make additional findings of fact.[6] Upon remand, on review of the same evidence as in the initial hearing, the IJ denied A.F.'s application for withholding of removal and CAT relief.[7] A.F. appealed the decision to the Board. On November 9, 2020, the Board denied A.F.'s appeal.[8] A.F. has a pending Motion for Reconsideration with the Board and a pending Petition for Review with the federal court. Nearly

---

[1] *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last updated Dec. 17, 2020). However, local reports previously put the number at 225. *See* Ex. J, Detention Centers See Increase in COVID-19 Cases, *available at*: https://www.kgns.tv/2020/08/12/detention-centers-see-increase-in-covid-19-cases/.
[2] Ex. S, Petitioner's Notice to Appear.
[3] See Ex. S, Petitioner's Notice to Appear (indicating that Petitioner's address was the South Texas Detention Complex as of Jan. 19, 2018). In approximately April 2020, A.F. was transferred to Webb, where he remains as of the time of filing.
[4] *See e.g.*, Ex. T, Petitioner's I-589.
[5] *See e.g.*, Ex. U, Initial IJ Decision (dated Apr. 22, 2019).
[6] *See e.g.*, Ex. V, Initial BIA Decision (dated Sept. 18, 2019).
[7] *See e.g.*, Ex. W, Second IJ Decision (dated Dec. 23, 2019).
[8] *See e.g.*, Ex. X, Second BIA Decision (dated Nov. 9, 2020).

three years after initially being detained, A.F. remains in detention. On December 17, 2020, A.F. received notice that Immigration and Customs Enforcement intended to remove him from the United States on December 22, 2020.[9]

A.F. submits that his detention is in violation of his constitutional and statutory rights. His prolonged detention is no longer justified under the Constitution. A.F. seeks an order from this Court declaring his continued and prolonged detention unlawful and ordering Respondents to release him from their custody.

## INTRODUCTION

1.      On March 13, 2020, Governor Abbott declared a State of Emergency in Texas due to COVID-19, a global pandemic that has infected more than 17,000,000 people in the United States[10] and 1,398,281 people in Texas.[11]  COVID-19 can have devastating effects on individuals' physical health. It can cause severe damage to lung tissue, kidney damage, liver damage, sepsis, respiratory failure, acute cardiac injury, heart failure, and death.[12]  The chance of requiring hospitalization due to COVID-19 increases with age, with those between 50 and 64 four times more likely to require hospitalization than those 18-29.[13]  COVID-19 has killed over 312,636  people in the United States,[14] including 25,226  Texans.[15]

---

[9] Ex. B, Affidavit of Priscilla Oliveraz, at ¶11.
[10] *CDC COVID Data Tracker*, CDC, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Dec. 19, 2020).
[11] *Texas Case Counts COVID-19*, Tex. Dep't State Health Servs., https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last updated Dec. 19, 2020, at 3:40 p.m.)
[12] *Heart, Kidneys, Brain, and More: COVID-19's Wide-ranging Effects*, TCTMD, https://www.tctmd.com/news/heart-kidneys-brain-and-more-covid-19s-wide-ranging-effects (last visited Dec. 19, 2020); *Complications Coronavirus Can Cause*, WebMD, https://www.webmd.com/lung/coronavirus-complications#1 (last visited Dec. 19, 2020).
[13] Ex. H, *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Dec. 20, 2020).
[14] *CDC COVID Data Tracker*, CDC, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Dec. 19, 2020).
[15] *Texas Case Counts COVID-19*, Tex. Dep't State Health Servs., https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last visited Dec. 19, 2020).

2.      Older individuals, immunocompromised individuals, and people with certain chronic health conditions including diabetes, asthma, heart conditions, and lung disease are at greater risk of contracting severe cases of COVID-19.[16] Many fatalities in the United States due to COVID-19 have been older individuals and individuals with chronic underlying medical conditions.[17]

3.      Vaccines have just recently been approved and are not yet available to the general public.[18] The U.S. Centers for Disease Control and Prevention ("CDC") recommends preventative strategies such as social distancing, intensive hand washing, decontamination of surfaces, wearing of masks, and isolation of people who are ill as ways to avoid COVID-19.[19]

4.      A.F is at a heightened risk of severe illness from COVID-19 due to his age and chronic underlying health conditions. Respondents prevent A.F. from being able to practice even the most basic precautions while detained. A.F. risks further commingling with potentially infected people during the deportation process. A.F. urges this Court to enjoin Respondents' ongoing unlawful detention, so that A.F. can practice the preventative strategies necessary to avoid becoming a victim of this historic global pandemic.

## CUSTODY

5.      A.F. is in the physical custody of Respondents Mario Garcia, Warden of the Webb County Detention Center ("Webb") in Laredo, Texas, Jose Correa, Field Office Director for ICE's San Antonio Field Office, Department of Homeland Security (DHS), Tony Pham, Acting Director

---

[16] People with Certain Medical Conditions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, (last accessed Dec. 20, 2020).
[17] COVID-19 Guidance for Older Adults, CDC, https://www.cdc.gov/aging/covid19-guidance.html (last accessed Dec. 20, 2020) ("Older adults and people of any age who have serious underlying medical conditions like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19 illness.").
[18] *When Vaccine is Limited, Who Gets Vaccinated First?*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations.html (last accessed Dec. 20, 2020).
[19] Ex. G, Centers for Disease Control and Prevention, "How to Protect Yourself," updated Nov. 27, 2020, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed Dec. 21, 2020).

of ICE; and Chad Wolf, Acting Secretary of DHS. At the time of the filing of this petition, A.F. remains detained at Webb. A.F. is under the direct control of Respondents and their agents.

## JURISDICTION

6.    This action arises under the Constitution of the United States, Amendments V and XIV, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and customary international law.

7.    This Court has jurisdiction under 28 U.S.C. 2241 (habeas corpus statute), art. I, § 9, cl. 2 of the United States Constitution ("Suspension Clause") and 28 U.S.C. § 1331 (federal questions), as A.F. is presently in custody under color of authority of the United States and such custody is in violation of the Constitution, laws, or treaties of the United States.

8.    Pursuant to 28 U.S.C. § 2241, district courts have jurisdiction to hear habeas petitions by noncitizens who challenge the lawfulness of their detention under federal law. *Demore v. Kim*, 538 U.S. 510, 516-17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *Creek v. Warden of Federal Medical Center*, Fed.Appx.(2000), 2020 WL 6938364 (per curiam) (unreported); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 794 (W.D. Tex. 2015).

## VENUE

9.    Venue in the Southern District of Texas is proper pursuant to 28 U.S.C. § 1391(b), because the Wardens and Officer in Charge of the detention center where A.F. is detained reside in this District, A.F. is currently detained in this District, and a substantial part of the events and omissions giving rise to A.F.'s claims occurred in this District.

## PARTIES

10.    Petitioner A.F. is 61-year-old native and citizen of Haiti with severe mental illness, who has been detained at federal immigration detention facilities since on or around January 2018.[20]

---

[20] A.F. was detained at South Texas Detention Center from approximately January 2018 to April 2020 and then

11.     Respondent William P. Barr is sued in his official capacity as the Attorney General of the United States and the head of the United States Department of Justice ("DOJ"). DOG is the federal agency responsible for the administration and enforcement of the immigration laws, and for advising the relevant federal Departments and agencies of their duties under the law.

12.     Respondent Jose Correa is sued in his official capacity as the Field Office Director for the San Antonio Field Office, ICE, DHS. He oversees all ICE/ERO functions and detainees in the San Antonio area, including detainees at Webb. He is A.F.'s immediate custodian, and pursuant to his order, A.F. remains detained.

13.     Respondent Mario Garcia is sued in his official capacity as Warden of the of the Webb County Detention Center, where A.F. is currently detained under the authority of ICE. As the Warden of Webb, he oversees, directs, and controls the detention center. He may alternatively be considered A.F.'s immediate custodian.

14.     Respondent Tony Pham is sued in his official capacity as Acting Director of ICE. In that capacity, he exercises authority over all ICE policies, procedures, and practices relating to ICE enforcement operations and detention facilities. He is responsible for ensuring that all people held in ICE custody are detained in accordance with law.

15.     Respondent Chad Wolf is sued in his official capacity as the acting Secretary of DHS. He is responsible for enforcing federal laws concerning border control and immigration. He has direct authority over ICE, which is responsible for the civil detention of immigrants in the United States.

16.     Respondent U.S. Immigration and Customs Enforcement is a component agency of DHS. ICE detains A.F. at Webb as part of a program or activity of an Executive agency and pursuant to

---

transferred to Webb, where he remains as of the time of filing. *See* Ex. S, Petitioner's Notice to Appear (indicating that Petitioner's address was the South Texas Detention Complex as of Jan. 19, 2018 and evidencing a DOB of 08/06/1959); *see also* Ex. A, Petitioner's Medical Records at 8 (diagnosis of schizophrenia); 13 (diagnoses of hepatitis A and hepatitis B); and 22 (diagnosis of tachycardia).

federal immigration law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17.    A.F. has exhausted his administrative remedies to the extent required by law, and his only remedy is by way of this judicial action.

18.    Alternatively, there is no statutory obligation for A.F. to exhaust his administrative remedies prior to filing this habeas petition and complaint, since he is not requesting review of a final order of removal. 8 U.S.C. § 1252(d)(1) (requiring exhaustion of administrative remedies prior to challenging removal order in circuit court).

19.    A.F. has no administrative remedies to exhaust through ICE because no process exists to challenge the unconstitutional conditions of his detention. Even if meaningful administrative remedies were available, A.F., as a noncitizen challenging the lawfulness of his ongoing immigration detention, is not required to exhaust them under 8 U.S.C. § 2241.

20.    A.F. did make a request for release pursuant to the *Fraihat v. ICE* nationwide preliminary injunction. *Fraihat v. ICE,* Case No. 5:19-cv-01546-JGB-SHK (C.D. Cal. Apr. 20, 2020), ECF No. E.[21]  Respondents denied A.F.'s request.[22]

## STATEMENT OF FACTS

### A. COVID-19 is an unprecedented public health crisis.

21.    COVID-19 is a public health crisis around the world. On March 11, 2020, the World Health Organization declared a  pandemic due to the spread of the novel coronavirus, COVID-19.[23]

22.    The Center for Disease Control (CDC) reports 17,592,760 confirmed cases of COVID-19

---

[21] *See* Ex. C, Petitioner's Fraihat Request; s*ee also* Ex. B, Affidavit of Priscilla Olivarez at ¶2.

[22] Ex. P, Denial of Frahait Request; *see also* Ex. B, Affidavit of Priscilla Olivarez at ¶¶3, 6; *see also* Ex. D, Counsel's Request for Additional Information re COVID Protocols.

[23] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

in the United States with 315,260 deaths as of December 21, 2020.[24] The number is quickly rising.

23.    In Texas, 1,398,281 cases of COVID-19 have been reported with 25,226 deaths.[25]

24.    On March 13, 2020, the President of the United States declared a national state of emergency in response to the COVID-19 outbreak.[26]

25.    The State of Texas declared a state-wide public health disaster on March 19, 2020, regarding COVID-19.[27]

26.    Webb County, where Webb is located, has the 13th highest number of COVID-19 cases out of the 254 counties in Texas with 23,915 people infected.[28] It also has the 11th highest number of deaths out of the Texas counties, with 433 people having died from the virus.[29] The county has dwindling capacity to protect persons from COVID-19. Already, in the summer months, one of the county's hospitals hit 100% of capacity in its intensive care unit beds that can handle COVID-19 patients and had to create an overflow area.[30] In July, six of the seven or eight beds that could fit in the overflow area were full.[31]

**B. COVID-19 poses grave risk of harm, particularly for those with certain medical conditions.**

27.    The risk of harm due to COVID-19 is particularly grave because of how the virus spreads

---

[24]    *Coronavirus Disease 2019 (COVID-19)*, CDC, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited December 21, 2020).

[25]    *Texas Case Counts COVID-19*, Tex. Dep't State Health Servs., https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last updated Dec. 19, 2020, at 3:40 p.m.).

[26]    Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), *available at*: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[27]    . *Texas Health Commissioner Declares Public Health Disaster*, Tex. Dep't State Health Servs. (Mar. 19, 2020), https://www.dshs.state.tx.us/news/releases/2020/20200319.aspx.

[28]    *Texas Case Counts COVID-19*, Tex. Dep't State Health Servs., https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last updated Dec. 19, 2020, at 3:40 p.m.).

[29]    *Id.*

[30]    Ex. I, Local hospital COVID-19 ICU at capacity, KGNS (July 10, 2020), *available at*: https://www.kgns.tv/2020/07/11/local-hospital-covid-19-icu-at-capacity.

[31]    *Id.*

and the severity of the resulting illness.

28.     A significant number of individuals who are infected remain asymptomatic. As CDC Director Dr. Robert Redfield explained, "That's important, because now you have individuals that may not have any symptoms that can contribute to transmission, and we have learned that in fact they do contribute to transmission."[32]

29.     In order to "slow the spread of the virus and help people who may have the virus and do not know it from transmitting it to others," the CDC now advises uses of cloth face coverings.[33]

30.     In many people, COVID-l9 causes fever, cough, and shortness of breath. In some people, however, it can result in serious illness or death.[34]

31.     Older adults and those with certain medical conditions face even greater chances of serious illness or death from COVID-19.[35]

32.     Certain underlying medical conditions, including asthma, blood disorders, chronic kidney and liver disease, immunosuppression, endocrine disorders (including diabetes), metabolic disorders, heart and lung disease, neurological and neurodevelopmental conditions, and current or recent pregnancy, increase the risk of serious COVID-19 disease for people of any age.[36]

---

[32] *CDC Director on Models for the Months to Come: "This Virus Is Going to Be with Us,"* NPR (Mar. 31, 2020), https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us.

[33] *Use of Cloth Face Coverings to Help Slow the Spread of COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html (last updated Nov. 12, 2020).

[34] *Symptoms of Coronavirus*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 13, 2020).

[35] *See Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12- March 16, 2020*, CDC Morbidity & Mortality Weekly Rep. (Mar. 26, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm.

[36] *See* Harv. Health Pub., Coronavirus Resource Center, Harv. Med. Sch., https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (last updated Dec. 19, 2020); *Groups at a Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated Dec. 1, 2020).

33.    Pneumonia appears to be the most frequent serious manifestation of infection.[37] Recent clinical evidence indicates that in persons who suffer severe symptoms, the virus may also cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems such as the blood and the immune system. This damage is so extensive and severe that it may be enduring. Among other things, patients who suffer severe symptoms from COVID-19 experience damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward. Indeed, studies of some recovered patients in China and Hong Kong indicate a declined lung function of 20% to 30% after recovery.[38]

34.    The median incubation period is five days, and serious complications can manifest not long after the onset of symptoms, with some patients descending suddenly and rapidly into respiratory distress.[39]

35.    The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. The fatality rate of people infected with COVID-19 can be as high as 3%,[40] in comparison with 0.1% for seasonal influenza.[41]

36.    The mortality rate for individuals with underlying conditions is much higher. For example, the mortality rate analyses from a February 29, 2020 WHO-China Joint Mission

---

[37] Wei-jie Guan, et al., *Clinical Characteristics of Coronavirus Disease 2019 in China*, New Eng. J. of Med. (Feb. 28, 2020), https://www.nejm.org/doi/full/10.1056/NEJMoa2002032.

[38] Tianbing Wang, et al., *Comorbidities and multi-organ injuries in the treatment of COVID-19*, 395 Lancet 10228 (2020), https://www.thelancet.com/journalsllancetlarticlefPllSO140-6736(20)30558-/fulltext; *GWHospital Uses Innovative VR Technology to Assess Its First COVID-19 Patient*, Geo. Wash. Univ. Hosp., (Mar. 19, 2020), https://www.gwhospital.comlresources/podcasts/covidl9-vr-technology.

[39] Stephen A. Lauer et al., *The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed Cases: Estimation and Application*, Annals of Internal Med. (March 10, 2020), https://annals.org/aim/fullarticle/2762808/incubation-period-coronavirus-disease-2019-covid-19-frompubliclyreported

[40] Nick Wilson, et al. *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, Emerging Infectious Disease J. (Mar. 13, 2020), https://doi.org/10.3201/eid2606.20032

[41] *Coronavirus disease 2019 (COVID-19) Situation Report – 46*, World Health Org. (March 6, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200306-silrep-46-covid-19.pdf?sfvrsn=96bO4adf_2.

Report indicated a mortality rate for individuals with cardiovascular disease at 13.2%.[42]

37.    The vaccine against COVID-19 has just recently been approved for use in the United States and is not yet available to the general public.[43] There is no information on when it will be available in detention facilities. The CDC recommends prevention as a current means to reduce the risk for vulnerable people from injury or death from COVID-19. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the effective measures for protecting vulnerable people from COVID-19.[44]

**C. The conditions of immigration detention facilities pose a heightened public health risk for the spread of COVID-19.**

38.    Immigration detention facilities are "congregate environments" or places where people live and sleep in close proximity. Infectious diseases communicated by air or touch are more likely to spread in these environments. This presents an increased danger for the spread of COVID-19 when introduced into a facility.[45]

39.    The risk of infectious spread is exacerbated by overcrowding, the proportion of vulnerable people detained, and often scant medical care resources. People live in close quarters and as a result, cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-

---

[42] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Org., at 12 (Feb. 29, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[43] *When Vaccine is Limited, Who Gets Vaccinated First?*, CDC, *available at*: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations.html.

[44] *How to Protect Yourself & Others*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (Updated Nov. 27, 2020).

[45] *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://Idoi.org/l0.1086/521910 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"); Claudia Lauer & Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, Associated Press (Mar. 7, 2020).

19. They may be unable to maintain the recommended distance of six feet from others and may share or touch objects used by others. Toilets, sinks, and showers are shared, without disinfection between each use. Food preparation and service is communal with little opportunity for surface disinfection.[46]

40.     Flu outbreaks occur regularly in jails and detention facilities. For example, in 2013, an outbreak of the stomach flu required the quarantine of 700 people at Cook Country Jail in Illinois.[47] Likewise, during the H1N1 epidemic in 2009, many jails and prisons faced high numbers of cases.[48]

41.     Jails and prisons are seeing outbreaks of COVID-19 grow at alarming rates. Less than two weeks after its first confirmed COVID-19 case on March 18, 2020, Rikers Island prison in New York City had 231 inmates with the virus.[49]  On April 2, 2020, a 58-year-old inmate became the first inmate to die in the New York state prison system.[50] He had tested positive a week earlier and did not appear to have any pre-existing health conditions, according to the Medical Examiner's autopsy.[51]

42.     On March 22, 2020, a jail guard who worked in the residential treatment unit of the Illinois Cook County Jail tested positive for COVID-19.[52] Two Illinois Cook County Jail detainees also

---

[46] *See e.g.*, Ex. K, Infection Control in Jails and Prisons; *see also* Ex. O, Hotbeds of Infection.
[47] Claudia Lauer & Colleen Long, *US prisons, jails on alert for spread of coronavirus*, Associated Press (Mar. 6, 2020), https://apnews.com/af98bOa38aaabedbcbOS9Q92db356697.
[48] Darjd M. Reutter, *Swine flu widespread in prisons and jails, but deaths are few*, PRISON LEGAL NEWS (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-butdeaths-are-few/.
[49] Catherine Kim, *Why people are being released from jails and prisons during the pandemic*, Vox (April 3, 2020), https://www.vox.com/2020/4/3/21200832/jail-prison-early-release-coronavirus-covid-19-incarcerated.
[50] *N.Y.C. Death Toll Tops 1,500 as Cuomo Warns on Ventilators*, N.Y. Times (Apr. 2, 2020), https://www.nytimes.com/2020/04/02/nyregion/coronavirus-new-york-update/html.
[51] *Id.*
[52] *Cook County Jail Reports Additional Positive Coronavirus Tests*, NBC Chi. (Mar. 24, 2020), https://www.nbcchicago.com/news/local/cook-county-jail-reports-additional-positive-coronavirus-tests/2243977/.

tested positive for COVID-19.[53] As of April 2, 2020, less than two weeks later, 167 inmates and

34 employees had tested positive, showing the rapidity of spread in a congregate setting.[54]

43.    On March 24, 2020, the first prisoner in a Texas prison tested positive for COVID-19.[55]

As of December 16, 2020, at least 7,730 Texas Department of Criminal Justice (TDCJ) staff

members and 27,273 offenders have tested positive for COVID-19.[56] The TDCJ has reported that

at least 177 offenders and 27 TDCJ employees are believed to have died because of COVID-19.[57]

44.    Recognizing the extraordinary circumstances of COVID-19 and its major risk of spreading

throughout institutionalized settings, the TDCJ stopped its intake of inmates from county jails. In

a letter to county sheriffs on April 11, 2020, TDCJ Executive Director Bryan Collier cited COVID-

19 prevention and said halting the transfers was "necessary and temporary" to protect employees

and inmates.[58]

45.    On March 24, the first ICE detainee tested positive, while being held at the same northern

New Jersey facility where a corrections officer tested positive a week earlier.[59] As of December

12, 2020, ICE reports 8,087 confirmed cases of COVID-19 among detainees.[60]

46.    The Director of the Illinois Department of Public Health, Dr. Ngozi Ezike, has highlighted

---

[53] Barbara Vitello, *Two Cook County Jail Inmates Positive for COVID-19*, Daily Herald (Mar. 23, 2020), https://www.dailyherald.com/news/20200323/two-cook-county-jail-inmates-positive-for-covid-19.

[54] *167 Cook County Jail Detainees Have Tested Positive for COVID-19, Officials Say*, NBC Chi. (Apr. 1, 2020), https://www.nbcchicago.com/news/local/167-cook-county-jail-detainees-have-tested-positive-for-covid-19-officials-say/2248892/ (stating that the number of detainees diagnosed with COVID- 19 in Cook County Jail had increased from 2 on March 23rd to 167 on April 1st).

[55] Jolie McCullough, *Coronavirus hits Texas prisons with first inmate case confirmed*, Texas Tribune (March 24, 2020), https://www.texastribune.org/2O2O/03/24/texas-prison-first-coronavirus-case/.

[56] *COVID-19 TDCJ Update*, Tex. Dep't Crim. Just., https://www.tdcj.texas.gov/covid-19/index2.html (last updated December 16, 2020).

[57] *Id.*

[58] Jacob Helker, "Texas state prisons halt intake of inmates from county jails," ABC 7 News Online, Apr. 13, 2020, *available at*: https://abc7amarillo.com/news/local/tdcj-halts-intake-of-inmates-from-county-jails (accessed Dec. 21, 2020).

[59] Priscilla Alvarez & Catherine E. Shoichet, *First ICE Detainee Tests Positive for Coronavirus*, CNN (Mar. 24, 2020), https://www.cnn.com12020/03/24/us/ice-detainee-coronavirus/index.html.

[60] *ICE Guidance on COVID-19*, Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last updated Dec. 12, 2020); *see also* Ex. E, 5,000 People Contract COVID While in ICE Custody.

that when the infection enters correctional facilities, the congregate nature of these facilities, with staff coming and going from the community each day in large numbers, will "provide unique challenges in stopping the spread of the disease and protecting the health of individuals."[61] She noted further that "[t]hose that are incarcerated obviously live and work and eat and study and recreate, all within that same environment, heightening the ability for COVID-19 to spread very quickly."[62]

47.    Long before COVID-19, ICE's failure to provide proper medical care is well documented, resulting, tragically, more than 30 deaths in ICE custody since 2017.[63]

48.    ICE reports 94 total cumulative cases at Webb on its website.[64] Local reports put the number at 225 as of August 11, 2020.[65]

**D. Deportation procedures further heighten an immigrant's risk of contracting COVID-19.**

49.    ICE Guidance on COVID-19 does not require testing prior to removal; the provision of face masks to detainees, or; social distancing during transportation to airports or on flights.[66]

50.    There is no systematic testing of detainees for COVID-19 prior to deportation. ICE explained to the Miami Herald that the agency would acquire approximately 2,000 tests a month

---

[61] Devin Trubey, *First Illinois Inmate Death Due to COVID-19*, ABC News Channel 20 (Mar. 30, 2020), https://newschannel20.com/news/coronavirus/first-illinois-inmate-death-due-to-covid-19.

[62] *Id.*

[63] *See* Hannah Rappleye & Lisa Riordan Seville, *24 Immigrants Have Died in ICE Custody During the Trump Administration*, NBC NEWS, June 9, 2019, https://www.nbcnews.com/politics/immigrationl24-immigrants-have-died-ice-custody-during-trump-administration-n1015291; Hamed Aleaziz, *Another Immigrant Has Died in ICE Custody. She's the Eighth Since October*, Buzzfeed News, March 8, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-died-ice-custody-healthcare-hospital-asylum; Altif Saadi, *Immigrants Are Suffering in Detention. They Need Adequate Healthcare Now*, L.A. Times, Feb. 20, 2019, https://www.latimes.com/opinion/op-ed/la-oe-saadi-immigration-health-care-detention-facilities-2019025-story.html.

[64] *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last updated Dec. 17, 2020).

[65] Ex. J, Detention Centers See Increase in COVID-19 Cases, *available at*: https://www.kgns.tv/2020/08/12/detention-centers-see-increase-in-covid-19-cases/.

[66] *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last updated Dec. 17, 2020).

"but given the nationwide shortages of testing kits, 'the agency likely won't have enough to test all aliens scheduled for future removals and will prioritize testing based on evolving operational considerations,' ICE said."[67]

51.     These inadequate medical screenings have already failed to detect cases in migrants being deported in the past few months. In Guatemala, the Health Minister testified in a congressional hearing that one such flight arrived with 75% of its passengers infected.[68]

52.     Reports also indicate that recently at least two Mexican and three Haitian deportees have also tested positive, yet had been placed on planes and/or buses with other deportees susceptible to infection.[69]

53.     In the report, Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows, The Center for Economic Policy and Research reports: "Because detainees are often flown across the country and are held in closely confined spaces, it is virtually impossible to adequately isolate those who have contracted COVID-19 or to ensure that those deported have not been exposed to COVID-19."[70]

54.     The risks of exposure to COVID-19 during removal are so great that on May 11, 2020, United States Representative Frederica Wilson introduced the Haitian Deportation Relief Act, which calls for the suspension of deportation of Haitian nationals until the COVID-19 pandemic

---

[67] Monique Madan and Jacqueline Charles, He says he has COVID and has never been to Haiti. But ICE still wants to deport him there., MIAMI HERALD (May 8, 2020), https://www.miamiherald.com/news/local/immigration/article242581381.html#storylink=cpy.

[68] Maria Martin, Official Alleges The U.S. Has Deported Many COVID-19-Positive Migrants To Guatemala, NPR (Apr. 15, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020 /04/15/834999661/official-alleges-the-u-s-has-deported-many-covid-19-positive-migrants-toguatemala.

[69] Kevin Sieff and Nick Miroff, U.S. is deporting infected migrants back to vulnerable countries, WASH. POST (April 21, 2020), https://www.washingtonpost.com/world/the_americas/us-is-deporting-infected-migrants-back-to-vulnerable-countries/2020/04/21/5ec3dcfe-8351-11ea-81a3-9690c9881111_story.html.

[70] Jake Johnston, Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows, CENTER FOR ECONOMIC & POLICY RESEARCH, April 27, 2020, https://www.cepr.net/exporting-covid-19-ice-air-conducted-deportation-flights-to-11-lac-countries-flight-data-shows/.

has ended in both the United States and Haiti.[71]

55.     The United States Department of State has said that medical facilities within Haiti are "scarce and generally substandard," and that life-threatening emergencies often require evacuation outside the country by air ambulance at the patient's expense.[72]

56.     In an April 27, 2020 address, President Moise acknowledged the high likelihood that "there will be famine" as a result of COVID-19.[73]

**E. ICE and Webb are woefully unprepared to protect A.F. from COVID-19.**

57.     On April 4, 2020, ICE determined that its Field Office Directors should reassess custody of detainees "over 60 years old" and detainees who are "immune-compromised," including individuals with "heart disease."[74] The presence of one of those factors . . . should be a significant discretionary factor weighing in favor of release," unless release would pose a danger to property or persons.[75] Even for detainees with past criminal convictions, the Directors should look at the age of the arrest as a mitigation factor.[76]

58.     The standards that ICE has issued for itself mandate that "[e]ach facility shall have written plans that address the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated), and reporting to local, state and

---

[71] Press Release, Rep. Frederica S. Wilson, Wilson Introduces Bill to Suspend Deportations to Haiti During Pandemic (May 11, 2020), https://wilson.house.gov/media-center/pressreleases/wilson-introduces-bill-to-suspend-deportations-to-haiti-during-pandemic.
[72] U.S. DEPARTMENT OF STATE, BUREAU OF CONSULAR AFFAIRS, Country Information: Haiti, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html (last visited Dec. 21, 2020) (follow "Health" hyperlink); *see also*, Ex. F, CDC Haiti Advisory.
[73] Samuel Louis, Jovenel Moïse Fears Famine in Haiti After Covid-19, HAITIAN TIMES, https://haitiantimes.com/2020/04/28/jovenel-moise-fears-famine-in-haiti-after-covid-19/ (last visited Dec. 21, 2020).
[74] Ex. L, Letter from Peter B. Berg, Assistant Director, Field Operations, to Field Office Directors and Deputy Field Office Directors entitled "COVID-19 Detained Docket Review," at 2-3, Apr. 04, 2020.
[75] *Id.* at 3.
[76] *Id.*

federal agencies." The standards also mandate that "[f]acilities *shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues*."[77]

59.    The interim guidance sheet provided on March 6, 2020, by ICE Health Services Corps, which oversees medical care in ICE detention facilities, as a protocol for their clinical COVID-19 response,[78] as well as ICE's guidance on its website,[79] is grossly deficient in multiple areas, including:

a. The ICE protocol fails to include basic infection control measures that are present in CDC guidelines for long-term care facilities, and other congregate settings, including access to hand sanitizer and use of masks for anyone with a cough.

b. The ICE protocol provides no guidance about identification of high-risk patients at the time of entry or any special precautions that will be enacted to protect them.

Declaration of Homer Venters at 10-12, *Fraihat v. US. Immigration & Customs Enf't*, No. 5:19-cv-01546-JGBSHK (C.D. Cal. Mar. 24, 2020), ECF No. 81-11.

60.    On or about April 13, 2020, thirty-three days after the World Health Organization declared COVID-19 to be a global pandemic, ICE issued a policy document for ICE detention facilities requiring detention facilities to take certain measures regarding COVID-19 ("ERO PRR").[80]  The ERO PRR is inadequate to provide safe conditions for A.F. It lacks deadlines, lacks a reporting or oversight structure by which to monitor compliance by detention facilities, lacks information on

---

[77] *Performance-Based National Detention Standards: 4.3 Medical Care*, USCIS, 270 (Dec. 2016), https://www.ice.gov/doclib/detention-standardsf2011/4-3.pdf (emphasis added).
[78] *Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)*, ICE Health Serv. Corps, Version 6.0 (Mar. 6, 2020), https://www.aila.org/infonet/ice-interim-reference-sheet-coronavirus
[79] *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (last visited Dec. 21, 2020)
[80] ICE Enforcement and Removal Operations, "COVID-19 Pandemic Response Requirements," *available at*: https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (accessed Dec. 21, 2020).

how detention facilities can procure hygiene supplies, PPE, or medical supplies, and it acknowledges, but then ignores the fact that the coronavirus can be transmitted by asymptomatic and pre-symptomatic individuals. It fails to outline specific action to be taken regarding medical monitoring, the provision of medical care within the detention facility, or the transfer of an individual requiring more intensive medical services or hospitalization.[81]

61.    ICE has failed to disclose the plans for each specific facility or detail how it is abiding by the plans it should have had in place. Webb has not disclosed how it is addressing COVID-19 and there is no evidence that Webb is taking any action to address COVID-19, including the most basic and essential: abiding by the social distancing advisories from the CDC and the Governor of Texas. Nothing on ICE's web page on coronavirus mentions Webb (except in regard to the number of confirmed COVID-19 cases) or any written plan to control the spread of coronavirus at any specific ICE facility (only information regarding mitigating the spread generally).[82]

62.    On at least four separate occasions, counsel for A.F. has requested, from ICE representatives, information about the specific protective measures in place at Webb, but no such information has been provided.[83]

63.    Webb is a privately-owned facility operated by CoreCivic, formerly known as the Corrections Corporation of America. CoreCivic maintains that Webb has the capacity to hold up to 480 adjust detainees but as recently as July 2019 it held 526 detainees.[84] A U.S. House of Representatives Committee on Oversight and Reform and Subcommittee on Civil Rights and Civil

---

[81] In addition, a September 2020 Compliance Report issued by the Office of Detention Oversight concluded that Webb County Detention Center had multiple deficiencies, including deficiencies regarding the medical care provided to mentally ill patients.  Office of Detention Oversight, Compliance Inspection at 6, 8.  These deficiencies highlight yet another reason that A.F. is not being adequately cared for by ICE and Webb.

[82] *See* ICE Guidance on COVID-19, ICE, https://www.ice.gov/coronavirus (last visited Dec. 21, 2020).

[83] Ex. B, Affidavit of Priscilla Olivarez at ¶¶3, 4, 5, and 7.

[84] Transactional Records Access Clearinghouse, "ICE Data Snapshots as of July 2019," *available at*: https://trac.syr.edu/phptools/immigration/detention (accessed Dec. 19, 2020).

Liberties Staff Report noted that "[i]n 2018, ICE found that a significant lack of physician coverage at CoreCivic's Webb County Detention Center in Texas was 'providing a degradation of services to detainee health care.'"[85] It also stated that "[a] 2018 internal audit at CoreCivic's Cibola County Correctional Center in New Mexico found persistent delays in medical care for detainees."[86]

64.    A.F. has informed counsel that he shares his dorm room with another individual.[87] He is given a mask if he leaves his dorm room, but he and his dorm mate do not wear masks within their room.[88] A.F. is responsible for the cleaning of his room, for which he is provided with a mop, broom, and "sanitary water."[89] His provided with hand sanitizer in his dorm room, but when he runs out, he sometimes must wait a day for more.[90] A.F. is not regularly tested for COVID-19.[91]

65.    In July, the Laredo Health Authority put Webb under a quarantine order in response to an outbreak at the facility. As reported by local news, "[u]nder the order, the detention center will not be allowed to take detainees outside of the facility except for emergency transfers to a hospital or to receive medical treatment or services."[92]

66.    Given that governors of multiple states have made urgent pleas for personal protective equipment and ventilators, and the President declared major disasters in New York, California, and Washington, it is difficult to believe that ICE has the necessary resources to implement its

---

[85]  The Trump Administration's Mistreatment of Detained Immigrants: Deaths and Deficient Medical Care by For-Profit Detention Contractors, U.S. House of Representatives Committee on Oversight and Reform and Subcommittee on Civil Rights and Civil Liberties Staff Report at 29, *available at*: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-09-24.%20Staff%20Report%20on%20ICE%20Contractors.pdf.

[86] *Id.*

[87] Ex. B, Affidavit.at ¶10.

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] Health authority issues quarantine order for detention center, KGNS (July 23, 2020), *available at*: https://www.kgns.tv/2020/07/23/health-authority-issues-quarantine-order-for-detention-center/ (accessed Dec. 21, 2020); *see also* Julia Wallace, Webb County Detention Center placed under quarantine due to COVID-19 outbreak, Laredo Morning Times (July 23, 2020), *available at*: https://www.lmtonline.com/news/article/Webb-County-Detention-Center-placed-under-15430080.php (accessed Dec. 21, 2020).

mitigation measures.[93]

**F. People most vulnerable to COVID-19 should be released from ICE detention.**

67.     People who are confined to detention centers will find it virtually impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission.

68.     Dr. Scott Allen and Dr. Josiah Rich, who are medical experts for the Department of Homeland Security, sent a letter to Congress arguing that the department should consider releasing all immigrant detainees who do not pose a risk to public safety before it is too late, writing that they were "gravely concerned about the threat the novel coronavirus poses."[94] There is an "imminent risk to the health and safety of immigrant detainees' and to the general public if the novel coronavirus spreads in ICE detention."[95] They warn, "To be more explicit, a detention center with a rapid outbreak could result in multiple detainees five, ten or more being sent to the local community hospital where there may only be six or eight ventilators over a very short period. As they fill up and overwhelm the ventilator resources, those ventilators are unavailable when the infection inevitably is carried by staff to the community and are also unavailable for all the usual critical illnesses (heart attacks, trauma, etc)."[96]

69.     John Sandweg, former acting director of ICE during the Obama Administration, explained that "ICE is fortunate that the threat posed by these detention centers can be mitigated rather easily. By releasing from custody the thousands of detainees who pose no threat to public safety and do not constitute an unmanageable flight risk, ICE can reduce the overcrowding of its detention

---

[93] *See Coronavirus Live Updates: As State Pleas Mount, Trump Outlines Some Federal Action; Senate Democrats Block Stimulus Package*, N.Y. Times (Mar. 22, 2020), https://www.nytimes.com/2020/03/22/world/coronavirus-updates-world-usa.html.
[94] Priscilla Alvarez & Catherine E. Shoichet, *First ICE detainee tests positive for coronavirus*, CNN (Mar. 24, 2020), https://www.cnn.com12020/03/24/us/ice-detainee-coronavirus/index.html.
[95] Catherine E. Shoichet, *Doctors warn of 'tinderbox scenario' if coronavirus spreads in ICE detention*, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.
[96] *Id.*

centers, and thus make them safer, while also putting fewer people at risk. . . . In fact, only a small percentage of those in ICE detention have been convicted of a violent crime. Many have never even been charged with a criminal offense. ICE can quickly reduce the detained population without endangering our communities."[97] He continued, "When an outbreak of COVID-19 occurs in an ICE facility, the detainees won't be the only ones at risk. An outbreak will expose the hundreds of ICE agents and officers, medical personnel, contract workers, and others who work in these facilities to the virus. Once exposed, many of them will unknowingly take the virus home to their family and community."[98]

70.    On March 23, 2020, the Ninth Circuit *sua sponte* ordered the immediate release of an immigrant detainee from detention due to COVID-19. X*ochihua Jaimes v. Barr*, 2020 WL 1429877, at *1 (9th Cir. Mar. 24, 2020). The Court emphasized that this decision was made "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers." *Id.*

71.    On April 17, 2020, the Southern District of Texas ordered the immediate release of an immigration detainee who was at higher risk based on her medical condition at the ICE facility in Conroe. *Vazquez Barrera v. Wolf*, 2020 WL 1904497 (S.D. Tex. April 17, 2020). In doing so, the court noted that "[c]ourts around the country have recognized similar assertions and ordered immediate release of particularly vulnerable detainees from ICE facilities under writs of habeas corpus as a result." *Id.* at *4.   On May 22, 2020, the Western District of Louisiana ordered the release of immigration detainees at LaSalle Detention Center. *Dada v. Witte*, No. 1:20-CV-00458, 2020 WL 2614616, (W.D. La. May 22, 2020). On March 26, 2020, the Southern District of New

---

[97] John Sandweg, *I Used to Run ICE. We Need to Release the Nonviolent Detainees*, The Atlantic (Mar. 22, 2020), https://www.theatlantic.com/ideas/archive/2020/03/release-ice-detainees/608536/.
[98] *Id.*

York ordered immediate release of a group of ICE detainees who suffer from chronic medical conditions and face an imminent risk of death or serious injury in detention if exposed to COVID-19. *Basank v. Decker*, 2020 WL 1481503, at *7 (S.D.N.Y. 2020). Again, on March 27, 2020, the Court ordered immediate release of another group of ICE detainees who faced imminent health risks. *Coronel v. Decker*, 2020 WL 1487274, at *10 (S.D.N.Y. 2020). That same day, the Central District of California ordered immediate release of two ICE detainees where "the Government fail[ed] to provide for [the] detainee's basic needs, including medical care and reasonable safety." *Castillo & Rueda v. Barr*, 2020 WL 1502864, at *3 (C.D. Cal. Mar. 27, 2020). Notably, neither of these two individuals had one of the CDC-listed medical vulnerabilities. *See id.* On April 2, 2020, the Central District of California ordered the release of six detainees with underlying health conditions including asthma, diabetes, high blood pressure, and HW infection. Temporary Restraining Order and Order to Show Cause, *Rodriguez v. Wolf*, No. 5:20-CV-00627-TJH-GJS (C.D. Cal. April 2, 2020), ECF Nos. 32, 35-39; *see also* Roxana Kopetman, *Coronavirus: Judge orders release of six immigrant detainees, citing health risk*, Press-Telegram (Apr. 2, 2020), https://www.presstelegram.com/2020/04/02/coronavirus-judge-orders-release-of-two-immigrant-detainees-siting-health-risk.

72.    Other courts continue to do the same as the pandemic spreads, stating that "[d]uring a deadly pandemic, the continued confinement of individuals being held to ensure that they appear at their immigration proceedings—not as punishment for any crime or with the primary aim of protecting public safety—does not serve the public's interest." *Valenzuela Arias v. Decker*, 2020 WL 1847986, at *9 (S.D.N.Y. Apr. 10, 2020) (granting TRO to release detainees with medical conditions); *id.* at *5 ("vulnerable individuals in immigration detention face irreparable harm to their health from COVID-19, and are entitled to habeas relief."); *Fofana v. Albence*, 2020 WL

1873307, at *1 (E.D. Mich. Apr. 15, 2020) (granting habeas petition for immigration detainee with medical condition).

73.     Likewise, detainees in criminal matters are being released from jails due to the risk of COVID-19. A federal judge in the Southern District of New York released a criminal defendant in pretrial detention on March 19, 2020, recognizing that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent." *United States v. Stephens*, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020).

74.     Efforts to reduce jail populations by releasing large numbers of detainees have been happening across the country. Such releases are not limited to only vulnerable individuals. Rather, non-violent offenders have been released in large-scale numbers to decrease overall jail populations and hopefully limit the risk of infection spread. In line with this approach, the Los Angeles County Sheriff decreased the jail population by ten percent by releasing 1,700 individuals in March.[99] In Alameda County in Northern California, more than 300 individuals were released from jail in the span of two weeks, amounting to eleven percent of the jail's population.[100] Oregon has similarly reduced its jail population in Washington County, outside Portland, by more than 120 inmates (from a population of 574), freeing up enough space for each remaining inmate to be housed in their own cell.[101]

75.     Release protects the people with vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for all people held or working in a prison, jail, or

[99] Justin Carissimo, *1,700 inmates released from Los Angeles County in response to coronavirus outbreak*, CBS News (Mar. 24, 2020), https://www.cbsnews.com/news/inmates-released-los-angeles-county-coronavirus-response-2020-03-24/.
[100] Bay City News, *Sheriff Releases 314 Inmates to Reduce Coronavirus Risk at Alameda County Jail*, NBC Bay Area, (Mar. 19, 2020), https://www.nbcbayarea.com/news/coronavirus/sheriff-releases-314-inmates-to-reducecoronavirus-risk-at-alameda-county-jail12258026/.
[101] Bob Heye, *Coronavirus and Crime: Jail releases, a rash of break-ins and one encouraging trend*, KATU (Mar. 23, 2020), https://katu.com/news/coronavirus/coronavirus-and-crime-jail-releases-a-rash-of-break-ins-and-one-encouraging-trend.

detention center. Release of both vulnerable people who are nonviolent from custody also reduces the burden on the region's limited health care infrastructure, lessening the likelihood that an overwhelming number of people will become seriously ill from COVID-19 and at the same time lessening the chance of overwhelming local hospitals.

**G. A.F. should be released from ICE detention in the United States.**

76.    A.F. has been diagnosed with tachycardia (condition resulting in rapid heart rate), hepatitis A, hepatitis B, and schizophrenia.[102] The CDC has identified heart conditions as a top vulnerability for severe illness from COVID-19.[103]

77.    Patients with schizophrenia are also at increased risk of complications due to COVID-19.[104]

78.    Hepatitis patients are also at an increased risk of negative outcomes as a result of COVID-19. [105]

79.    Due to A.F.'s diagnoses of tachycardia (condition resulting in rapid heart rate), hepatitis A, hepatitis B, and schizophrenia, A.F. is at an increased risk of complications due to COVID-19.

80.    A.F. made a request for release pursuant to the *Fraihat v. ICE* nationwide preliminary injunction. *Fraihat v. ICE,* Case No. 5:19-cv-01546-JGB-SHK (C.D. Cal. Apr. 20, 2020), ECF

---

[102] Ex. A, Petitioner's Medical Records at 8 (diagnosis of schizophrenia); 13 (diagnoses of hepatitis A and hepatitis B); and 22 (diagnosis of tachycardia).

[103] *People with Certain Medical Conditions*, CDC,  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last reviewed Dec. 19, 2020)

[104] Nora Palomar-Ciria et al., *Schizophrenia and COVID delirium*, Psychiatry Res. (Aug. 2020), *available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7251413/ ("COVID-19 has already had a great impact in the general population worldwide and patients diagnosed with schizophrenia are at greater risk of infection and its consequences…").

[105] Mohammad K Parvez, *COVID-19 and coronaviral hepatitis: evidence of collateral damage*, Future Virol. (May 2020), *available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7291768/

("Moreover, chronic liver disease patients with impaired immunity because of classical hepatitis viruses (HBV, HCV, HDV and HEV) or other hepatotropic viruses (HGV, GBV, TTV and SENV) infection or nonalcoholic fatty liver disease/nonalcoholic steatohepatitis are more susceptible to COVID-19, and may present worse outcomes from acute respiratory distress syndrome compared with the other critically ill patients.").

No. E.[106]  Respondents denied A.F.'s request.[107]

81.     On December 17, 2020, A.F. received notice of a removal date of December 22, 2020.

82.     A.F. would have limited access to necessary health care in Haiti if he were to be removed

to Haiti.[108]

## LEGAL BACKGROUND

**1.     Respondents have subjected A.F. to punishment in violation of the Due Process Clause of the Fifth Amendment because Plaintiff has a substantive due process right to protection from exposure to an impermissibly high risk of contracting COVID-19 and to be free from punitive conditions.**

83.     It is long settled law "for over a century that all aliens within our territory are 'persons'

entitled to the protection of the Due Process Clause" of the Fifth Amendment. *Zadvydas*, 533 U.S.

at 690, 693. Immigration detainees' constitutional rights flow from the procedural and substantive

due process guarantees of the Fifth Amendment. *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir.

2000); *Ortega v. Rowe*, 796 F.2d 765, 767 (5th Cir. 1986) ("We consider a person detained for

deportation to be the equivalent of a pretrial detainee; a pretrial detainee's constitutional claims are

considered under the due process clause instead of the Eighth Amendment."). Plaintiff's due

process rights are at least as great as those of person detained in pretrial detention before an

adjudication of guilt. *Edwards*, 209 F.3d at 778.

84.     The Fifth Amendment prohibits the U.S. government from depriving any "persons . . . of

. . . liberty . . . without due process of law." U.S. Const. amend. X. The Supreme Court has held

that "[f]reedom from imprisonment—from government custody, detention, or other forms of

---

[106] *See* Ex. C, Petitioner's Fraihat Request; s*ee also* Ex. B, Affidavit of Priscilla Olivarez at ¶2.
[107] *See* Ex. P, Denial of Petitioner's Fraihat Request; *see also*, Ex. D, Counsel's Request for Additional Information re COVID Protocols.
[108] U.S. DEPARTMENT OF STATE, BUREAU OF CONSULAR AFFAIRS, Country Information: Haiti, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html (last visited Dec. 21, 2020) (follow "Health" hyperlink) (noting that medical facilities within Haiti are "scarce and generally substandard."); *see also* Ex. F, CDC Haiti Advisory.

physical restraint—lies at the heart of the liberty that the Clause protects," *Zadzydas*, 533 U.S. at 690, and that this protection is enjoyed by "all 'persons' within the United States, including aliens whether his presence here is lawful, unlawful, temporary, or permanent." *Id*. at 693.

85.     When the government restrains an individual's freedom through detention, it assumes an "affirmative duty to protect" his well-being and provide for his basic needs, including medical care and reasonable safety. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). It transgresses the substantive limits on state action set by the Constitution for the government to take away an individual's freedom to care for his or herself and at the same time fail to protect his or her liberty interests and basic needs. *Id.*

86.     When the government detains a person for the violation of an immigration law, the person is a civil detainee, even if he has a prior criminal conviction. See *Zadvydas*, 533 U.S. at 690. Civil detainees such as Petitioner is "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 322.

87.     The detention of civil detainees may only be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. 690. Thus, the detention of a noncitizen by the government is contrary to the Due Process Clause "unless the detention is ordered in a criminal proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* at 690 (internal citations and quotations omitted). Civil detention becomes unconstitutional when "punitive" in nature, meaning that it is "not [or no longer] reasonably related to a legitimate, non-punitive government objective." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997). The government violates the due process rights of

26

a person in civil detention where the conditions "amount to punishment." *Bell Wolfish*, 441 U.S. 520, 535 (1979).

88.     A constitutional challenge to illegality of the detention based on the facts of "general conditions of confinement" is subject to the reasonable relationship standard outlined by the Supreme Court in *Wolfish*. Petitioner is not required to show that Respondents had subjective awareness of the substantial risk of serious harm of COVID-19 to them, although if such a showing is required that standard is met under the circumstances here. *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996); *Scott*, 114 F.3d at 52; *see also Shepherd*, 591 F.3d at 454 (a petitioner challenging general conditions "is relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish"). Under the *Wolfish* reasonable relationship test, in cases grounded in unconstitutional conditions of confinement, "the plaintiff need only show that such a condition, which is alleged to be the cause of a constitutional violation, has no reasonable relationship to a legitimate governmental interest." *Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 207 (5th Cir. 2011).

89.     A.F.'s claims are subject to the *Wolfish* reasonable relationship test because they challenge extended, pervasive conditions, policies and practices at the Webb County Detention Center. *See Scott*, 114 F.3d at 53. The U.S. District Court for the Southern District of Texas has applied the *Wolfish* standard to exactly the same issue as in this case: ICE detainees request for immediate release in light of COVID-19. *Vazquez Barrera*, 2020 WL 1904497, at *5.

90.     The conditions at Webb "[amount] to unconstitutional punishment" because there is a "pervasive pattern of serious deficiencies" that subjects A.F. to the risk of serious illness or death. *Shepherd*, 591 F.3d at 454. This pattern is demonstrated by failing to provide adequate protections against a known risk of serious infection. *See Duvall*, 631 F.3d at 208.

91.    Petitioner is entitled to immediate release when they have shown that his detention is not reasonably related to a legitimate government interest.

92.    In this case, A.F. is being held as a civil detainee under the discretion of ICE on behalf of the U.S. government. *See supra*, Parties ¶¶ 10-16. A.F. alleges that he is being detained by Respondents under conditions that prevent them from adequately protecting himself from contracting the deadly COVID-19 virus. *Id.* Specifically, Respondents deny A.F. the ability social distance and access to basic hygiene during this pandemic by the following actions:

a)  keeping A.F. in a detention facility without the means to social distance;[109]

b)  providing only a mop, broom, and "sanitary water" for use in cleaning shared living facilities;[110]

c)  failing to adequately monitor detainees for COVID-19 and to do so on a regular basis;[111]

d)  failing to provide adequate access to masks;[112] and

e)  failing to provide information on procedures in place to combat the spread of COVID-19.[113]

When "detention necessarily prevents Plaintiff from protecting himself . . . [and] . . . protecting his own health from a high risk of serious illness or death . . . [such detention] . . . does not reasonably relate to a legitimate governmental purpose and thus, violates the Fifth Amendment." *Vazquez Barrera*, 2020 WL 1904497, at *5.

93.    While Respondents' have an interest in the proper execution of the immigration laws of the United States, this interest does not extinguish the interest in fundamental constitutional and

---

[109] Ex. B, Affidavit of Priscilla Olivarez at ¶10.
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.*

statutory rights that Plaintiff possess. *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *13 (E.D. Mich. Apr. 5, 2020).

94.     Detention for noncriminal purposes is only permissible in narrow nonpunitive cases "where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas*, 533 U.S. at 690 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997).

95.     The only legitimate purpose for federal civil immigration detention is to prevent flight risk and ensure the detainee's attendance for a legal hearing on his status or removal. *Zadvydas*, 533 U.S. at 699. This purpose is dramatically undermined when the detainees' interests, as in the present case, are interests of maintaining the *status quo* of his life and good health that will be seriously threatened if they are exposed to disease that renders them seriously ill or even dead, making continued detention in these circumstances arbitrary and purposeless under *Wolfish*.

96.     Numerous courts have ordered release of people in civil immigration custody in recognition of the threat posed by COVID-19 especially to those with underlying vulnerabilities. *See Vazquez Barrera*, 2020 WL 1904497, at *5-*8 (ordering release of detainee at high risk serious illness or death if they contracted COVID-19); *Dada v. Witte*, Case No. 1:20-cv-00458, 2020 WL 2614616 (W.D. La. May 22, 2020) (ordering the release of fourteen detainees); *Jose B.R. v. Tsiaris*, No. CV 20-3347 (MCA), 2020 WL 2744586, at *11, *14 (D.N.J. May 27, 2020) (ordering release of detainee with serious mental illness); *Kolawole O T. v. Ahrendt*, No. CV 19-21802 (MCA), 2020 WL 3073940, at *9, *11 (D.N.J. June 10, 2020) (ordering release of individual with serious mental illness and worsening mental health during COVID-19); *Doe v. Barr*, No. 20-CV-02263-RMI, 2020 WL 1984266, at *9, *11 (N.D. Cal. Apr. 27, 2020) (granting a TRO to release an immigration detainee with PTSD, depression, and latent tuberculosis).

97.     Under these circumstances and conditions Respondents' detention of A.F. amounts to punishment and violates A.F.'s substantive due process rights. Consequently, Respondents hold A.F. in custody in violation of the Fifth Amendment to the United States Constitution. A writ of habeas corpus, pursuant to 28 U.S.C. § 2241, is therefore necessary to remedy this constitutional violation and to remove the unreasonable risk that A.F. will contract COVID-19 and suffer serious physical injury and harm.

   **2.      Respondents' decision not to release Plaintiff to allow them to protect himself from COVID-19 infection fails to provide named Plaintiff accommodations for his disability in a manner inconsistent with the Rehabilitation Act**

98.     Section 504 of the Rehabilitation Act ("Section 504") provides that "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794.

99.     Respondent ICE is an Executive agency within the meaning of the Rehabilitation Act. Respondent's actions violated and violate the Rehabilitation Act because they constitute discrimination on the basis of disability. Respondent's actions also constitute retaliation in violation of the Rehabilitation Act.

100.    DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30; *see also* 29 U.S.C. § 794(a). The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified

handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

101.    Lack of access to medical supplies necessary for full participation in the activities of the detention center, such as a wheelchair or cane, has been shown in *Kaufman* as an example of inadequate medical care. *Kaufman v. Carter*, 952 F. Supp. 520, 523-24 (W.D. Mich. 1996). Under epidemic conditions, access to proper masks and sanitation materials should be considered under the definition of necessary medical supplies. Additionally, *Kaufman* asserts that detainees must have access to detention showers and toilets without risk of injury. *Kaufman*, 952 F. Supp. at 523-24. Finally, precedent demonstrates that discrimination includes a lack of access to the dining hall and recreation area. *Love v. Westville Corr. Cntr.*, 103 F.3d 558 (7th Cir. 1996).

102.    Additionally, recent directives have highlighted the specific vulnerability of detainees with disabilities or serious medical illness, and directed the Department of Homeland Security to consider release from detention if release is "consistent with requirements of mandatory detention, public safety, and other immigration enforcement considerations." *See* U.S. Immigration and Customs Enforcement Directive 11065.1, Review of the Use of Segregation for ICE (2013) § 5.2 This directive is in alignment with the *Fraihat v. ICE* nationwide preliminary injunction issued on April 20, 2020 ordering ICE to (1) immediately identify and track individuals in its custody with certain defined factors that makes them especially vulnerable to COVID-19 and (2) make timely custody redeterminations for all class members, including for people whose custody has already been reviewed. *Fraihat*, 2020 WL 1932570, at *29. These orders are based on an understanding that the high risk to life as a result of the COVID-19 epidemic makes it so that no reasonable accommodation for individuals with disabilities can be made within a detention environment

during the epidemic, and therefore the only reasonable accommodation is immediate release.

103.    The services, programs, and activities within the detention center receive substantial federal financial assistance and are programs and activities conducted by an Executive agency. A.F. is entitled to participate in those services, programs, and activities.

104.    A.F. is a qualified individual with a disability for the purposes of Section 504. Plaintiff's disabilities are schizophrenia, hepatitis A, hepatitis B, and tachycardia.[114] These disabilities make him more susceptible to contracting the deadly disease of COVID-19 than most other people.

105.    Counsel for A.F. has sought information regarding safeguards being taken to ensure A.F. was kept safe on at least four occasions.[115] Respondents did not respond to those requests.[116]  A.F. has requested release as the only remaining action capable of accommodating his disabilities.[117]

106.    These requests have been denied by Respondents or failed to be addressed by Respondents, constructively denying them.[118]

107.    By failing to take account of A.F.'s vulnerabilities to severe illness or death if he contracts COVID-19 and by exposing A.F. to a heightened risk of contracting COVID-19, Respondents prevented A.F. from participating in the services, programs, and activities within Webb by reason of his disabilities.

108.    Respondents also prevent Plaintiff from participating in the services, programs, and activities within Webb by reason of his disabilities, by failing to provide A.F. with adequate personal protective equipment and products, sanitary conditions, and the ability to maintain

---

[114] Ex. A, Petitioner's Medical Records at 8 (diagnosis of schizophrenia); 13 (diagnoses of hepatitis A and hepatitis B); and 22 (diagnosis of tachycardia).
[115] Ex. B, Affidavit of Priscilla Olivarez at ¶¶3, 4, 5, and 7.
[116] *Id.*
[117] Ex. C, Petitioner's Fraihat Request.
[118] Ex. B, Affidavit of Priscilla Olivarez at ¶¶3, 4, 5, and 7; Ex. P, Denial of Petitioner's Fraihat Request; Ex. D, Counsel's Request for Additional Information re COVID Protocols.

hygienic practices that would allow A.F. to safely reside with other detainees.[119]

109.    Respondents' actions have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of removal proceedings and the services, programs, and activities within the detention facilities with respect to A.F.

110.    Respondents fail to reasonably accommodate A.F.'s disabilities by his failing to ameliorate the conditions that prevent A.F. from employing the only known means of protecting himself from infection and by failing to release A.F. from Webb when no others means of accommodating his disabilities existed or was practicable.

111.    Respondents' disparate treatment of Plaintiff based on his disabilities and Respondents' failure to provide A.F. with reasonable accommodations constitute disability discrimination in violation of Section 504.

### 3.    Respondents' decision not to release Plaintiff is contrary to the international law applicable to the United States

112.    Customary international law applicable to the Member States of the Organization of American States includes the right to life[120] and the right to health.[121] These rights are secured under customary international law that is applicable to the United States.

113.    For more than a century, the Supreme Court of the United States has held that customary international law "is part of our law, and must be ascertained and administered by the courts of justice as often as such questions are presented in litigation between man and man, duly submitted to his determination." *Hilton v. Guyot*, 159 U.S. 113, 163 (1895); *see also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 348 (2016).

---

[119] Ex. B Affidavit of Priscilla Olivarez at ¶10.
[120] Art. XXV of the American Declaration on the Rights and Duties of Man, and art. 6, para. 1, of the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171, entered into force February 10, 1972, which the United States has ratified, includes the right to life as a treaty obligation.
[121] Art. XI of the American Declaration on the Rights and Duties of Man includes the right to health.

114.     Moreover, whenever possible, United States law and particularly administrative regulations or Guidelines applying the law must be interpreted in a manner consistent with the United States' voluntarily accepted international legal obligations. *See Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) ("[A]n Act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.")

115.     In this case, there is unequivocal treaty and customary international law that creates obligations for the United States government and all its agency and employees to ensure the life and health of detainees under the jurisdiction of the United States government.

116.     The obligation of the U.S. courts to uphold the treaty obligations of the United States emanates from the U.S. Constitution, art. III, § 2, and is supported by more than a century of precedents of the Supreme Court of the United States. *See* U.S. Const. art. II, §3; *Worcester v. Georgia*, 31 U.S. 515, 594 (1932) (holding that treaties with native American Nations are treaties that "must be respected and enforced by the appropriate organs of the Federal Government"); *Dooley v. United States*, 182 U.S. 222,231-32 (1901) (Justice Henry Billings Brown citing with approval the seminal work of American General Henry Wager Halleck, a jurist and expert in international law, stating that the "[t]he stipulations of treaties . . . are obligatory upon the nations that have entered into to them . . . and therefore the Executive is bound by the laws of war that are international law") (internal citation omitted); *Hamdan v. Rumsfeld*, 548 U. S. 557, 635 (2006) ("[T]he Executive is bound to comply with the rule of law" including international law).

117.     Similarly, the obligation of the U.S. courts to apply customary international law has been consistently upheld since the establishment of the United States. *See* U.S. Const. art. III, § 2, cl. 1; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 729 (2004) (holding that "[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations [i.e. customary

international law]"); *Dooley v. United States*, 182 U.S. 222 (1901); *Hilton*, 159 U.S. at 163 (stating that "[t]he most certain guide . . . [to the applicable international law] is a treaty or a statute . . . [but] when . . . there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is") *The Paquete Habana*, 175 U.S. 677, 700, 708 (1900) (stating that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for his determination" and that "[t]his rule of international law is one which . . . [this Court] . . . administering the law of nations are bound to take judicial notice of, and to give effect to "); *Bolivarian Republic of Venezuela, et al. v. Helmerich & Payne International Drilling Co., et al*, 137 S. Ct. 348 (2017).

118.    Indeed, the American Law Institute's *The Restatement (Third) of the Foreign Relations Law of the United States* (1987), states that "[i]nternational law and international agreements of the United States are law of the United States . . . [c]ases arising under international law or international agreements of the United States are within the Judicial Power of the United States . . . ." The American Law Institute, the Restatement (Third) of the Foreign Relations Law of the United States (1987) § 111.

119.    In this case there is applicable international law unequivocally affirming the human rights to life and health.

120.    The Inter-American Court of Human Rights has held that the American Declaration on the Rights and Duties of Man, OAS Res. XXX, adopted by the 9th International Conference of American States (1948), reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 17 (1992), reflects customary international law binding on OAS Member States. Interpretation of the American Declaration of the Rights and

Duties of Man (Article 64 of the American Convention on Human Rights), *Advisory Opinion OC-10/89*, Inter-Am. Ct. H.R., Ser. A, No. 10, 1 17 (July 14, 1989), http://hrlibrary.umn.edu/iachr/b_11_4j.htm (accessed Dec. 20, 2020) at para. 37-43. The customary international law reflected in the Declaration includes the right to life protected as part of the right to security of person guaranteed by article XXV of the ADRDM and the right to health in article XI of the ADRDM.

121.    Moreover, as a Member State of the United Nations, the United States is obliged to protect the rights to life and health by virtue of article 56 that states: "All Members pledge himself to take joint and separate action in co-operation with the Organization for the achievement of the purposes set forth in Article 55." Art. 56, Charter of the United Nations (1945).

### i) Right to life

122.    The right to life means at least that a government detaining persons under its jurisdiction must ensure his right to life by protecting the detainees from contracting the deadly virus of COVID-19.

123.    Article I of the American Declaration of the Rights and Duties of Man contains an expression of the right to life that is found in numerous treaties. These treaties include the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), which is ratified by the United States and 172 other countries. In addition, numerous regional human rights treaties include the right to life. *See*, *e.g.*, Art. 4, American Convention on Human Rights, 1144 U.N.T.S. 123 (1978); Art. 4, African Charter on Human and Peoples' Rights, OAU Doc. CAB/LEG/67/3 Rev. 5 (1981); Art. 2, European Convention for the Protection of Human Rights and Fundamental Freedom, 213 U.N.T.S. 222 (1953); art. 5 of the Arab Charter on Human Rights, *reprinted in* 12 *Int'l Hum. Rts. Rep*. 893 (2005); art. 6 of the Convention on the Rights of the Child, 1577 UNTS

3 (1990). In addition, the right to life is affirmed in article 3 of the Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc A/810 at 71 (1948), an instrument adopted by the affirmative vote of 48 of the 58 United Nations Member States at that time, including the United States, which was instrumental in its drafting.

124.    This right undoubtedly includes the obligation of the U.S. government not to place persons under its care in situations where his lives could be threatened. Detaining migrants in detention centers in which they cannot protect himself from the deadly COVID-19 virus is an action that is inconsistent with this obligation and therefore, invokes the responsibility of the United States for an internationally wrongful act.

### ii) Right to health

125.    The human right to health is well established in international law, and it has been agreed to by almost all States in the international community. Indeed, this view is held by the majority of Americans in 2010 and likely significantly increasingly today.[122] Importantly, the United States has confirmed in its *opinio juris* that health is a human right and that it is one the United States strives to achieve in practice.[123] That is not surprising considering that the United States ratified the World Health Organization's (WHO) Constitution that recognizes that the "enjoyment of the highest attainable standard of health is one of the fundamental rights of every human being." Preamble, WHO Constitution (1946).

126.    The United States is a Member State of the Organization of American States,[124] and by ratifying that organization's constitutive instrument it has undertaken to ensure the right to health

---

[122] *See* Cynthia Soohoo & Johan Goldberg, *The Full Realization of Our Rights: The Right to Health in State Constitutions*, 60 Case W. Res. L. Rev. 997, 998 ("Seventy-two percent of Americans strongly believe that health care should be considered a human right.").

[123] *Prepared Remarks of Secretary Kathleen Sebelius at the World Health Assembly Plenary Session Location: Geneva, Switzerland on Monday, May 20, 2013*, Federal News Service (May 20, 2013).

[124] *See* OAS Member States, *available at*: http://www.oas.org/en/about/member_states.asp.

as noted above.

127.    The view that the right to health has achieved recognition as customary international law is reflected in the expression of this right as a legal binding obligation by the majority of countries in the world. For example, 170 of the United Nations 193 Members States have ratified the International Covenant on Economic, Social and Cultural Rights which contains the right to health in article 12. 993 UNTS 3 (1966). The UN Committee on Economic, Social and Cultural Rights, which is the body created by the United Nations Economic and Social Council, of which the United States is a Member State, in a General Comment on article 12 has explained that this right "is a fundamental human right indispensable for the exercise of other human rights."[125] It goes on to explain that although "the right to health is not to be understood as a right to be healthy," it does create states' obligations  and these obligations may be violated.  *Id.* The duties are defined as "immediate obligations . . . [to] . . . guarantee that the right will be exercised without discrimination of any kind" and that States must take action that is "deliberate, concrete and targeted towards the full realization of the right to health." *Id*.

128.    Additional expressions of the right to health are found in human rights treaties dealing with specific groups or persons or specific rights such as article 5(e)(iv) of the International Convention on the Elimination of All Forms of Racial Discrimination, 660 UNTS 195 (1969), which was ratified by the United States on October 21, 1994 together with 181 other countries; articles 11(1)f, 12 and 14(2)b of the Convention on the Elimination of All Forms of Discrimination against Women, 1249 UNTS 13 (1981), which is ratified by 189 countries; and article 24 of the Convention on the Rights of the Child, 1577 UNTS 3 (1990), which is ratified by 196 countries,

---

[125] CESCR, General Comment 14: The right to the highest attainable standard of health (22nd Sess.), UN Doc. E/C.12/2000/4 (2000) *reprinted in* Compilation of General Comments and General Recommendations adopted by Human Rights Treaty Bodies, UN Doc. HRI/GEN/1/Rev.6 at 85 (2003) at para. 1.

among other treaties.

129.    There are additional regional instruments containing the human right to health in regional contexts. The 53 states of the Organization of African Unity (today the African Union) adopted the African Charter on Human and Peoples' Rights that provides that "[e]very individual shall have the right to enjoy the best attainable state of physical and mental health."[126] In addition, a Protocol to the African Charter concerning violence against women[127] and the African Charter on the Rights and Welfare of the Child[128] both reiterate the right to health. In the Inter-American context the San Salvador Protocol[129] to the American Convention on Human Rights provides that "[e]veryone shall have the right to health, understood to mean the enjoyment of the highest level of physical, mental and social well- being . . . [and that] . . . [i]n order to ensure the exercise of the right to health, the States Parties agree to recognize health as a public good."[130] In the European context, both the European Social Charter[131] of the Council of Europe as well as the Charter of Fundamental Rights of the European Union[132] contain the right to health. More recently, both the League of Arab States[133] and the Association of South East Asian Nations[134] have adopted instruments that reaffirm his commitment to human rights, the former explicitly and the latter implicitly, and

---

[126] Art. 16 of the ACHPR, OAU Doc. CAB/LEG/67/3 Rev. 5 (1981).

[127] Protocol to the ACHPR on the Rights of Women in Africa, adopted by the 2nd Ord. Sess. of the Assembly of the African Union, Maputo, AU Doc. CAB/LEG/66.6 (13 September 2000), *entered into force* 25 November 2005, especially article 14.

[128] OAU Doc. CAB/LEG/24.9/49 (1990), *entered into force* 29 November 1999, especially articles 14 and 11(2)(h).

[129] Additional Protocol of the American Convention on Human Rights in the Area of Economic, Social and Cultural Rights, approved by the Final Act of the Ninth Conference of American States 38-45 (Washington, D.C., 1948).

[130] *Id*. especially article 10.

[131] 529 *UNTS* 89, *entered into force* 26 February 1965, especially article 11; and revised and adopted as European Social Charter (revised), *ETS* No. 163, *entered into force* 7 January 1999, especially articles 11 and 13.

[132] 2000 *Official Journal of the European Union* (C 364) 1 (7 December 2000), especially article 35.

[133] Arab Charter on Human Rights, adopted by the League of Arab States, on 22 May 2004 *reprinted in* 12 *Int'l Hum. Rts. Rep.* 893 (2005), *entered into force* 15 March 2008, particularly articles 38 and 39.

[134] *See generally*, the Charter of the Association of South East Asian Nations, adopted on 20 November 2007 in Singapore, *accessed at* http://www.aseansec.org/21069.pdf (last accessed 12 July 2009) and ASEAN, *Draft Terms of Reference of [an ASEAN Human Rights Body]*, para. 1.4 (dated 15 January 2009) accessed at http://www.scribd.com/doc/12882981/Draft-of-ASEAN-Human-Right-Body?autodown=pdf (10 August 2009).

recognize the right to health in his respective regional contexts. In other words, there is not region of the world in which the overwhelming majority of states have not agreed that health is a human right. Even international organizations that cut across regional boundaries, such as the Organization of Islamic States, have endorsed the human right to health.[135]

130.    There are also numerous UN and WHO resolutions reiterating the right to health. For example, in June 2009 the UN Human Rights Council adopted a resolution on Preventable maternal mortality and morbidity and human rights.[136] While these resolutions are not legally binding on their own they do contribute authoritative interpretations of the legally binding obligations created by treaties.

131.    While there may be different interpretations of the customary international law right to health, it has been consistently interpreted to mean at least that a government detaining persons under its jurisdiction must ensure the right of the detainees to adequate medical care for serious illnesses and must take adequate steps to protect the detainees from contracting deadly diseases.

132.    Furthermore, failure to ensure protection for the right to health of detainees under the control of the U.S. government authorities in circumstances where the threat of harm or even death is extremely serious may constitute "severe pain or suffering, whether physical or mental, [that] is intentionally inflicted on a person for such purposes as . . . punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind," in violation of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, which is ratified by 170 countries, including the United States.

---

[135] *See* art. 17 of the Cairo Declaration on Human Rights in Islam, adopted at the 14th Islamic Conference of Foreign Ministers, Res. No. 49/19-P (1990) and art. 15 of the Covenant on the Rights of the Child in Islam, adopted in OIC Doc. OIC/9-IGGE/HRI/2004/Rep. Final (2004), not yet *entered into force*.
[136] UN HRC Res. No. 11/8, UN Doc. UN Doc. A/HRC/11/L.11 at pp. 64-68 (19 June 2009).

133.    By failing to take adequate measures to protect Plaintiff's life and health from COVID-19, Respondents have interfered with Plaintiff's right to life and health. And because these interferences are continuing, Respondents have shown the unwillingness or inability to provide protections. Such a delinquency incurs the State responsibility of the United States and can have serious consequences for the United States. This Court, absent a clear indication by the government that it intends to act inconsistent with its international legal obligations, should ensure that the United States and all its agencies, including ICE, respect the international legal obligations to ensure the rights to life and health. The appropriate remedy to ensure the United States acts consistent with its international legal obligations is to release Plaintiff so they can make his best efforts to protect themselves, something they cannot do while in the discretionary detention of ICE.

### 4.    ICE has the authority to release detained people in its custody.

134.    It is well within ICE's prosecutorial discretion to comply with these constitutional requirements by releasing people who would be vulnerable to severe illness or death from COVID-19.

135.    People with experience as high-level ICE officials confirm this fact. As former Deputy Assistant Director for Custody Programs in ICE Enforcement and Removal Operations Andrew Lorenzen-Strait explains, "ICE has exercised and still exercises discretion for purposes of releasing individuals with serious medical conditions from detention." In fact, "ICE exercises humanitarian parole authority all the time for serious medical reasons."[137]

136.    This exercise of discretion comes from a long line of agency directives explicitly

---

[137] Declaration of Andrew Lorenzen-Strait at 1-2, *Dawson v. Asher*, 2:20-cv-00409-JLR-MAT (W.D. Wash. Mar. 16, 2020), ECF No. 7, *available at* https://www.aclu.org/sites/defaultlfiles/field_document/ 7_declaration_of_andrew_lorenzen-strait.pdf.

instructing officers to exercise favorable discretion in cases involving severe medical concerns and other humanitarian equities militating against detention.

**5.    This Court has the authority to order A.F.'s release to vindicate his rights, and such relief is appropriate here.**

137.    "When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

138.    Courts have regularly exercised this authority to remedy constitutional violations caused by overcrowding. *See Ruiz v. Lynaugh*, 811 F.2d 856 (5th Cir. 1987) (holding that the district court did not abuse its discretion in refusing to allow Department of Collections to use substandard facilities to house inmates); *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap).

139.    The same principle applies here. As the constitutional principles and public health experts make clear, releasing A.F. is the only viable remedy to ensure his safety from the threat to health that COVID-19 poses.

140.    The Second Circuit recently found that "[c]ourts can and must help ensure that constitutional boundaries are not transgressed by considerations of expediency. At the same time, the careful balancing of needs and rights that such emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level." *Fed. Defenders of N.Y. v. Fed. Bureau of Prisons*, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

141.    In the face of this great threat, social distancing and hygiene measures are only defense against COVID-19. Those protective measures are exceedingly difficult, if not impossible, in the environment of an immigration detention center, where A.F. shares toilets, sinks, and showers, eat in communal spaces, and is in close contact with the many other detainees and officers around

him. These conditions pose even greater risk of infectious spread, and as a result, A.F. faces unreasonable harm from continued detention.

142.    Numerous courts have now ordered release of civil detainees like A.F. in light of the threat of COVID-19. *See supra* ¶75. As the Southern District of Texas stated about two weeks ago, "detention of Plaintiffs, who are at high risk of serious illness or death if they contract COVID-19, in [ICE detention], where social distancing an proper hygiene are impossible, does not reasonably relate to a legitimate governmental purpose. . . . [and] violates the Fifth Amendment." *Vazquez Barrera*, 2020 WL 1904497, at *5; *see also Fraihat* Order, *supra*, at ¶115 ("Defendants' inactions are likely 'arbitrary or purposeless,' and are excessive given the nature and purpose [of] civil detention.").

143.    The combination of COVID-19's real, imminent, and serious threat to health and the prolonged detention A.F. has already endured indicate that his due process rights may only vindicated upon his release from detention.

## CLAIMS FOR RELIEF

**COUNT ONE**
**Violation of the Right to Substantive Due Process**

1.    A.F. repeats and incorporates by reference the allegations above.

2.    Respondents' conduct violates A.F.'s right to substantive due process under the Fifth Amendment of the U.S. Constitution.

3.    Respondents' conduct violates A.F.'s right to substantive due process under the Fourteenth Amendment of the U.S. Constitution.

**COUNT TWO**
**Violation of the Rehabilitation Act**

4.    A.F. realleges and incorporate by reference the allegations made above.

43

5.      Section 504 of the Rehabilitation Act ("Section 504") provides that "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794.

6.      Section 504 of the Rehabilitation Act requires federal agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

7.      DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30; *see also* 29 U.S.C. § 794(a). The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

8.      Respondent (ICE) is an Executive agency within the meaning of the Rehabilitation Act.

9.      A.F. is a qualified individual with a disability, schizophrenia, hepatitis A, hepatitis B, and tachycardia, for the purposes of Section 504.

10.     The services, programs, and activities within the Facility receive substantial federal financial assistance and are programs and activities conducted by an Executive agency. The removal process, including adjudications of applications for relief from removal, is a benefit administered by DHS. A.F. is entitled to participate in that benefit.

11.     By failing to take account of A.F.'s vulnerability to severe illness or death if he contracts

44

COVID-19 and by exposing him to a heightened risk of contracting COVID-19, Respondents intentionally prevent A.F. from participating in the removal process and the services, programs, and activities within the detention facility by reason of his disabilities.

12.     Respondents' actions have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of removal proceedings and the services, programs, and activities within the detention facilities with respect to A.F.

13.     Respondents fail to "reasonably accommodate" A.F.'s disability by failing to ameliorate the conditions that prevent him from employing the only known means of protecting himself from infection or by failing to release A.F. from the detention facility.

14.     Respondents' disparate treatment of A.F. based on his disability, Respondents' use of criteria or methods of administration with respect to the removal process and the services, programs, and activities within the detention facility, and Respondents' failure to provide A.F. with reasonable accommodations constitute disability discrimination in violation of Section 504.

**COUNT THREE**
**Violation of the International Law**

15.     Plaintiff reallege and incorporate by reference the allegations made above.

16.     The human rights to life and health are part of customary international law applicable to the United States.

17.     These human rights require the Respondents take affirmative steps to ensure that Petitioner is not subjected to reasonably preventable threats to his life and/or health.

18.     To protect Plaintiff's human life and health from the deadly COVID-19 virus, Respondents must take action to allows Plaintiff to socially distance himself from others, to use hand and sanitizer soap to maintain his hygiene, and to have his living quarters cleaned regularly with proper cleaning products that will remove the COVID-19 virus. Respondents have been unable or unwilling to do any of these things. Plaintiff still live in crowded quarters unable to maintain the

advised six-foot distance from each other. Petitioner is still unable to practice adequate hygiene because they are denied access to adequate quantities of hand sanitizer and soap. And Petitioner is forced by Respondents to live in close quarters that are not properly cleaned.

19.    Respondents by failing to take adequate measures to ensure the human rights to life and health, obligations that are incumbent on the Respondents under customary international law, commit internationally wrongful acts to which the consequences of State responsibility attach. These consequences require at least that Respondents release Plaintiff to bring this internationally wrongful act to an end.

**PRAYER FOR RELIEF**

WHEREFORE, A.F. prays that this Court grant the following relief:

1.  Assume jurisdiction over this matter;

2.  Issue an order directing Respondents to show cause why the writ should not issue;

3.  Order Respondents to file with the Court a complete copy of the administrative file from the Department of Justice and the Department of Homeland Security;

4.  Enjoin ICE from transferring A.F. outside of the Southern District of Texas while this matter is pending;

5.  Issue a writ of habeas corpus ordering Respondents to release A.F. upon reasonable conditions of supervision;

6.  Award A.F. reasonable costs and attorney's fees; and,

7.  Grant any other relief which this Court deems just and proper.

Dated: December 21, 2020                    Respectfully submitted,


                                           /s/ Curtis FJ Doebbler
                                           Curtis FJ Doebbler
                                           Texas Bar No. 24105187
                                           S.D.TX No. 3544360
                                           Refugee and Immigrant Center for
                                           Education and Legal Services (RAICES)
                                           802 Kentucky Ave
                                           San Antonio, Texas 78201
                                           Tel: +1-210-780-0054
                                           Fax: +1-210-212-4856
                                           Email: curtis.doebbler@raicestexas.org

                                           *Pro Bono Counsel for Petitioner*


                                           **BAKER BOTTS L.L.P.**
                                           Maddy R. Dwertman*
                                           Texas Bar No. 24092371
                                           maddy.dwertman@bakerbotts.com
                                           Leah Burcat*
                                           Texas Bar No. 24092193
                                           leah.burcat@bakerbotts.com
                                           98 San Jacinto Blvd., Suite 1500
                                           Austin, Texas 78702
                                           (512) 322-2500
                                           (512) 322-2501 (facsimile)

                                           *Pro Bono Counsel for Petitioner*

                                           *Application to appear *pro hac vice*
                                           forthcoming

**<u>Verification Pursuant to 28 U.S.C. § 2242</u>**

The undersigned counsel submits this verification on behalf of the Petitioner. Undersigned counsel has been made aware of the events described in this Petition for Writ of Habeas Corpus having reviewed the relevant materials and spoken with Petitioner's counsel and therefore verifies that the statements in this Petition are true and correct to the best of his knowledge.

Dated:          December 21, 2020

*/s/* Curtis FJ Doebbler _____
Counsel for Petitioner

## TABLE OF CONTENTS

| Exhibit | Document |
|---------|----------|
| A | Petitioner's Medical Records |
| B | Affidavit of Priscilla Olivarez |
| C | Petitioner's Fraihat Request |
| D | Counsel's Request for Additional Information re COVID Protocols |
| E | *5,000 People Contract COVID-19 While in ICE Custody* |
| F | CDC Haiti Advisory |
| G | *How to Protect Yourself & Others*, CDC |
| H | *Older Adults and COVID-19*, CDC |
| I | *Local hospital COVID-19 ICU at capacity* |
| J | *Detention centers see increase in COVID-19 cases* |
| K | Infection Control in Jails and Prisons |
| L | Letter from Peter B. Berg, Assistant Director, Field Operations, to Field Office Directors and Deputy Field Office Directors entitled "COVID-19 Detained Docket Review" |
| M | *Prognosis analysis of patients with mental disorders with COVID-19* |
| N | Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC |
| O | *Hotbeds of Infection* |
| P | Denial of Petitioner's Fraihat Request |
| Q | COVID-19: Focus on Persons Deprived of Liberty |
| R | Joint Statement by UNHCR, IOM, OHCHR, and WHO |
| S | Petitioner's Notice to Appear |
| T | Petitioner's I-589 |
| U | Initial IJ Decision (dated Apr. 22, 2019) |
| V | Initial BIA Decision (dated Sept. 18, 2019) |
| W | Second IJ Decision (dated Dec. 23, 2019) |
| X | Second BIA Decision (dated Nov. 9, 2020) |

## CERTIFICATE OF SERVICE

I, Curtis FJ Doebbler, hereby certify that on December 21, 2020, a copy of the foregoing Petition for Writ of Habeas Corpus, was served by electronic mail to Respondents

/s/ Curtis FJ Doebbler
Curtis FJ Doebbler

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## LAREDO DIVISION

**ALEX FRANCOIS**,

   Petitioner,

   v.


**WILLIAM BARR**, U.S. Attorney
General; **CHAD WOLF**; Acting
Secretary, Dept. of Homeland Security;
**JOSE CORREA**, Field Office Director,
San Antonio Field Office, U.S.
Immigration and Customs Enforcement;
**MARIO GARCIA**, Warden, Webb
County Detention Center; **TONY PHAM**,
Acting Director of U.S. Immigration and
Customs Enforcement; and **UNITED
STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT**,

   Respondents.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

**CAUSE NO. _____**

**PETITION FOR WRIT OF HABEAS
CORPUS PURSUANT TO 28 U.S.C. §
2241**

## ORDER TO SHOW CAUSE

Comes now to be considered Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.

After considering Petitioner's application for issuance of writ of habeas corpus, this Court orders

that Respondents show cause as to why this writ of habeas corpus should not be granted.

Accordingly, it is ORDERED that:

(1) Respondents show cause as to why the writ should not be granted;

(2) Respondents file with the Court a complete copy of the administrative file from the

  Department of Justice and the Department of Homeland Security;

(3) Respondents are enjoined from moving Petitioner outside of the Southern District of Texas while this matter is pending;

(4) Respondents shall immediately release Petitioner under reasonable conditions of supervision if they cannot show cause as to why the writ should not be granted;

(5) Petitioner be awarded attorney fees under the Equal Access to Justice Act.

IT IS SO ORDERED.

ORDERED, SIGNED, and ENTERED this _____ day of _____, 20___.

_____

U.S. District Judge